UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


NIZZERA T. KIMBALL              CIVIL ACTION NO. 06-1413

VERSUS
                               DISTRICT JUDGE DEE D. DRELL

HARTFORD LIFE & ACCIDENT
        INSURANCE COMPANY      U.S. MAGISTRATE JUDGE JAMES D. KIRK


## REPORT AND RECOMMENDATION

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation.  The case is ready for decision on briefs on the merits in accordance with the ERISA Case Order [Doc. #9].

## Facts

Claimant, Nizerra T. Kimball (Kimball), born November 16, 1946 and who was 53 years old when she left her employment, was employed at Wal-Mart. Prior to working at Wal-Mart, she had been employed by K-Mart as a meat wrapper when she suffered an on-the-job injury due to a spill of chlorine bleach resulting in reactive airways disease syndrome (RADS).

Kimball left work in April 2000 and filed an application for benefits under a Long Term Disability Plan (Plan) offered by her

employer, Wal-Mart, and insured by Hartford Life & Accident Insurance Company (Hartford) who also serves as the Plan administrator. The Attending Physician's Statement by Dr. John Valentino listed the primary diagnosis as RADS and secondary diagnosis as chronic obstructive pulmonary disease (COPD). Long term benefits were approved and became effective on November 13, 2000.

As of November 13, 2001, under the terms of the policy in order for claimant's benefits to continue, she was required to be unable to perform the duties of any occupation based on her education, training or experience. Claimant was later approved for benefits to continue after November 13, 2001. Claimant was required to apply for Social Security Disability benefits which she did. Social Security benefits were awarded effective July 2000. In accordance with the Hartford Plan, disability benefits were reduced on account of the Social Security award.

Over the years since claimant had been awarded disability benefits by Hartford, Hartford periodically reviewed her continued eligibility for benefits, each time noting that "Cx cont's to meet def Dis", which I interpret to mean "claimant continues to meet the definition of disability". In September 2003, Hartford's examiner noted that with the restrictions on push/pull and carrying, the claimant would continue to meet the definition of disability.

2

In early 2004, Hartford decided to again request "annual forms" and updated medical records. Hartford requested that Dr. Valentino order an FCE but he refused because he did not need it[1]. Hartford then requested a review by "MAG" which assigned the task to their Dr. Popovich. Dr. Popovich concluded, by letter of January 17, 2005, that claimant was capable of working in a "mainly sedentary capacity in a clean environment, with limited standing and walking as tolerated and the additional restriction that she not lift, push or pull more than 10 pounds."

Hartford then requested an employability analysis report (EAR). The report concluded that Kimball could perform the duties of full time of telephone solicitor or of surveillance system monitor. Hartford's examiner notes state that "[g]iven the lack of severity documented in medical records, no evidence of recent multiple hospitalizations and MAGs (sic) opinion, appropriate decision to term[inate] claim". A letter was sent to Kimball terminating her benefits on February 7, 2005. Kimball's attorney sent a letter to Hartford appealing the decision and also enclosing additional medical information including pulmonary function studies confirming her diagnosis of RADS. He also attached other medical records including a report from Dr. Valentino dated March 30, 2005.

On June 30, 2005, Hartford's examiner noted that it "[a]ppears the claimant's medical condition may be more severe than we first

---

[1] Dr. Valentino later suggested an FCE be done by a physiatrist.

3

determined". It was decided that the file would be sent to another reviewer, UDC, for review.  UDC asked its physician, Dr. Siegel, to look at the file. Based on his report, the denial decision was upheld by Hartford on August 1, 2005; claimant was notified on August 2, 2005. Kimball's attorney then forwarded a videotape of an interview with Kimball to Hartford for consideration, which Hartford refused to review since all appeals under its Plan had been exhausted[2].

This suit was filed in this court  on August 18, 2006.

### **Standard of Review**

In accordance with this court's standing ERISA Case Order, the parties agree that the group long term disability plan (Plan) issued by defendant, Hartford, to Wal-Mart is an employee welfare benefit plan, as defined by the provisions of ERISA, and that this case is governed by ERISA and that all state law claims are preempted.  The parties also agree that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits.  Both Claimant and Defendant agree that

---

[2] Claimant filed a motion to supplement the record with the video tape (doc. #16), which was granted by me based on the express holding of the 5th Circuit in Vega v. Nat'l. Life Ins. Servs., Inc., 188 F.3d 299 (5th C. 1999) (en banc), and affirmed on appeal to the district judge (doc. #43).  The decision is final in this court, yet defendants continue to (improperly) argue in brief that the decision was wrong, attaching to its brief a copy of an unpublished 5th C. opinion (Keele v. JP Morgan Chase, 221 Fed. Appx. 316 (5th C. 2007)) which outlines "a number of practical problems" with strict application of Vega. If the rule of Vega is to be changed, it is for the court of appeal to do; this court will follow Vega as long as it is valid Fifth Circuit law. However, this court will not hold that the insurer's refusal to consider the evidence is, per se, proof that the insurer's decision was arbitrary and capricious. Vega does not require such a result and Keele expressly rejected that argument (f.n.2).

the administrative record is complete. However, because the administrator is both insurer and administrator and is thus conflicted, the court will give a modicum less deference to the administrator's decision.  <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

### The Plan

The Plan provides, in pertinent part:

> After that [12 months] you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience. H-0038

### The Medical Records

The claimant's diagnosis is not challenged by Hartford. Hartford does challenge its severity as being sufficient to prevent Kimball from working. Initially the diagnosis was restrictive airways disease syndrome (RADS) and a secondary diagnosis was COPD. Later, the diagnoses were listed as RADS and hypertension. It is the RADS with which the medical evidence has been most concerned.

The medical records reflect that claimant has been treated for her respiratory ailments since 1998. She was primarily followed by Dr. John Valentino (now deceased), a family practitioner in Alexandria, through the time of the denial of her appeal. In January, 2003 Kimball was noted to be using her nebulizer[3] machine

---

[3] A nebulizer is a machine used to treat asthma, COPD, and other conditions where inhaled medicines are indicated.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

four times a day and every four hours, as needed. In addition, she was taking numerous prescription medications including Advair[4], Avelox[5], Cozaar[6], Primidone[7], Flovent[8], Uniphyl[9], Proventil inhaler[10], Lipitor[11], Albuterol solution, Prevacid[12] and Singulair[13]. Claimant followed regularly with Dr. Valentino. On April 30, 2003, Kimball was still noted to be using the nebulizer machine and additional

---

[4] Used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma, COPD, and other lung diseases. it is a steroid and reduces swelling in the airways. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[5] Avelox is an antibiotic and is used to eliminate bacteria in the lungs. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[6] Cozaar is used to treat high blood pressure. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[7] Primidone is used to control seizures. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[8] Flovent is an oral inhalant used to prevent difficulty breathing, chest tightness, wheezing and coughing caused by asthma. It is a corticosteroid. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[9] Uniphyl is used to prevent and treat wheezing, shortness of breath, and difficulty breathing caused by asthma and other lung diseases. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[10] Albuterol which is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and COPD. It is a bronchodilator and works by relaxing and opening air passages to the lungs to make breathing easier. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[11] Lipitor is used to treat high cholesterol. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[12] Used to treat ulcers and gastroesophageal reflux disease (GERD). See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[13] Used to treat difficulty breathing, chest tightness, wheezing and coughing caused by asthma. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

6

medications included Cardura[14] and Covera[15], Lasix[16] and Estrace[17]. She complained of shortness of breath and wheezing. She was prescribed steroids. A month later she complained of cough and congestion and wheezing. She was to still use the nebulizer machine. In August, she was taking Xanax[18] at bedtime, but otherwise, her medications were the same.

In May 2004, she had not been seen by Dr. Valentino since August 2003. She was still using her nebulizer machine and taking the other medicines. She also uses an Albuterol rescue inhaler. She was depressed. Her lungs were "nice and clear". In June, she was seen again, for unrelated issues. In November, 2004, Hartford sent a letter to Dr. Valentino regarding Kimball's ability to work. The doctor disagreed that she could work with the suggested restrictions and he observed that "you don't seem to believe me when I say this patient is disabled from any and all gainful employment." Although the doctor had previously stated that he did

---

[14] Cardura is used to relax the bladder, and sometimes for high blood pressure.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[15] Covera is used to treat irregular heartbeat and high blood pressure. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[16] Lasix is used to reduce swelling and fluid retention.  It can also be used to treat high blood pressure. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[17] Estrace is estrogen, a female hormone. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[18] Used to treat anxiety disorders and panic attacks. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

not need a functional capacity evaluation (FCE), he noted that "needs functional capacity evaluation by a physiatrist".

Records from Dr. Paul Guillory, ENT, dated May 11, 2004 document a sensorineural hearing loss. He recommended that she wear hearing protection.

Finally, after the denial of benefits in January 2005, Dr. Valentino sent Kimball's attorney a letter dated March 30, 2005:

> I have taken care of Ms. Nizzera Kimball since 1997. In my medical opinion, she has been totally disabled from any gainful employment since January of 2000. She has a chronic lung disease with acute reactive airway disease and severe hypertension. She is extremely reactive to multiple stimuli, both chemical and physical. Ms. Kimball has a home nebulizer machine that she uses four times a day or every four hours as needed. She uses a steroid inhaler once a day. She has a rescue inhaler that she uses every two to four hours when the nebulizer machine does not relieve her bronchospasm or she is out of the house. She uses some type of inhaled medication every 2 to 4 hours, usually around the clock. She has a chronic cough. Most of the time she does wheeze and is short of breath, making it difficult for her to carry on a conversation. Her stimuli include temperatures, either too hot or too cold, environmental problems, such as mold or yeast, and chemical stimulants, such as cleaning chemicals, perfumes, after shaves, and deodorants. She has seen several pulmonary specialists who have adjusted her medications but she just does not seem to respond to treatment as well as we would like.

Dr. Popovich, employed by MAG to review the file, summarized the medical records in a letter dated January 17, 2005. However, his report was prior to Dr. Valentino's letter of March 30, 2005[19].

---

[19] This is the letter that prompted the Hartford examiner to observe that Kimball's medical condition "may be more severe than we first determined".

Dr. Popovich found, based on his review of the medical records, that Kimball's hypertension and asthma were "generally well controlled." He decided she could work for eight hours a day in a sedentary capacity in a clean environment, with limited standing and walking as tolerated and the additional restriction that she not lift, push or pull more than 10 pounds.

After claimant's appeal was filed, Hartford sent the claim to UDC and its physician, Dr. Siegel, reviewed the medical records. He reported his findings by letter dated July 29, 2005. He summarized that Kimball is "independent with activities of daily living and instrumental activities of daily living. Although she sometimes gets help from her daughter, Dr. Valentino has not had to order any visiting nurse or home care services including chore services, meal preparation services, home health aide services, or transportation services." He concluded that she should be able to perform sedentary to light physical demand work activities. Physical restrictions would include 10 to 20 pound lifting restrictions, alternating sitting and standing and rotation of job tasks and activities. She should work in a well-ventilated area with limited exposures to dust, mist, odors, perfumes, smoke, or extreme changes in temperature such as extreme cold or heat conditions.

Siegel also found that she could perform an occupation "which requires extensive telephone usage although there are some notes suggestive that she has a sensory neural hearing loss". He noted

9

that her hearing loss should not affect normal conversational sounds and observed that Dr. Guillory, the specialist ENT, had recommended hearing protection.

### Review for Abuse of Discretion

Kimball does not contest the administrator's interpretation of the Plan. See Wildbur v. ARCO Chem. Co., 974 F.2d 631 (5th Cir. 1992). Rather, claimant, through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator.

Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan language. Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286 (5th Cir. 1998). In determining whether an administrator abused its discretion, we look to whether that administrator was arbitrary or capricious. "An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial'." Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d

211, 215 (5th Cir. 1999).  See also <u>Vega v. Nat'l Life Ins. Servs.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

_____The initial denial in this case was based on three things: 1) Dr. Valentino's records did not substantiate a severe asthmatic condition, 2) Valentino did not order a functional capacity exam (FCE), and 3) alternative occupations were identified which claimant could perform[20].

1)   <u>Severe condition</u>?

Kimball plainly has a severe medical condition; however, it should be pointed out that the policy does not require a "severe condition", but only that claimant is unable to work because of a "sickness" (H-0038).  Objective medical evidence supports that claimant has a sickness.

The initial denial letter, dated February 7, 2007  first briefly summarizes the definition of disability and the medical records documenting claimant's shortness of breath and wheezing. The letter fails to note, however,  Kimball's regular use of a nebulizer or her need for other rescue inhalers. The letter also states that Dr. Guillory, the ENT, had found she did not have any restrictions on account of her sensorineural hearing loss. In fact, Guillory had recommended that claimant wear hearing protection.

---

[20] The regulations promulgated by the Secretary under 29 U.S.C. §1133 require that the initial notice of denial of benefits contain, *inter alia*, the specific reasons for the denial. 29 C.F.R. §2560.503-1(f).

The medical records demonstrate very clearly a severe asthmatic condition or RADS as outlined above. Hartford's statement to the contrary is simply wrong as shown by the medical records discussed above. It supported its erroneous conclusion by observing that Kimball has no history of hospitalizations "which would be expected for a severe disability condition". This statement is not supported by the Plan language nor is it based on any medical opinion found in the record.

Although Dr. Siegel notes that claimant has not required oxygen, emergency room visits, frequent visits with Dr. Valentino or hospitalizations, regular pulmonary follow-up, home health care, meal preparation services, and so forth, such does not mean she is not disabled, in view of the extensive positive evidence of her disease and limitations and disability found in the record. Obviously, a person can be disabled from working based on a diagnosed medical condition without the need for repetitive follow-up diagnostic testing. Just as obviously, a person may be disabled without needing to be hospitilized, go to the emergency room, or even be seen by her doctor regularly. Receipt of home health services, or meal preparation assistance is not a requirement for disability under the Plan or established ERISA law[21].

---

[21] The evidence shows that claimant's daughter assists her with her needs.

Claimant suffers from a "sickness" as is clear from her treating doctors' records, with which the reviewing physicians do not disagree.  This ground for terminating benefits is meritless.

2)  The FCE

The fact that Dr. Valentino would not order his patient to undergo an FCE is mentioned repeatedly in the Hartford letters and claims examiner notes, including the initial denial letter.

The FCE is something that Hartford thought was needed in order to properly evaluate Kimball's claim. It is listed in the initial denial letter as being one of the reasons the claim was denied. Yet Hartford never ordered an FCE. Instead, it simply noted in its documents that Dr. Valentino would not order one.

The Plan expressly allows Hartford to have claimant examined to determine if she is disabled. (H-0055). If Hartford felt that Dr. Valentino's limitations were not correct, it could have ordered its own FCE. As it is, however, the physical limitations of Kimball are those set forth by Dr. Valentino and her other treating physicians and only summarized in part by Drs. Popovich and Siegel. Without an FCE, there is no other evidence in the record of physical capacity.

In summarizing the limitations, however, Hartford's reviewing doctors did not include as restrictions claimant's need to take nebulizer treatments every four hours, her need to wear hearing

13

protection, her hearing loss, or her difficulty in carrying on normal conversation.

That there has been no FCE is not a valid basis for discontinuing benefits. If Hartford wanted an FCE it could have obtained one without Dr. Valentino's assistance or consent. Without one, the issue is properly whether claimant can perform the duties of a job based on the limitations and restrictions that are apparent from the evidence as it stands.

3) <u>Alternative occupations</u>

Hartford had an employability analysis report (EAR) done. To come up with the two jobs which Hartford claims Kimball can do, it used a computer program. In order to find jobs for claimant, Hartford had to input information into the computer program, OASYS, including her general education, aptitudes, temperament and work functions. For some of these qualities, she was assigned a mathematical score.  For example, for reasoning, she is a 4. For verbal aptitude, she was given a 3. The conflicted administrator's employee, Marvin Bryant, apparently entered the information and ran the program.  The computer then spits out the answer, that is, the jobs in its database that match the criteria input by Hartford's employee. In this case there were two matches--telephone solicitor, which the computer thought was a "good" match, and surveillance system monitor, which was only a "fair" match. The top match category is "closest" which represents excellent job

14

transferability skills. There were no "closest" matches for Mrs. Kimball.

However, the report prepared by Bryant did not consider the medical report of Dr. Valentino dated March 30, 2005, nor did it consider the report of Hartford's reviewer, Dr. Siegel. Instead, the report considered only the opinion of Dr. Popovich, Hartford's initial reviewer. The only restrictions entered, based on Popovich's opinion, were that Kimball "work mainly in a sedentary environment with limited standing and walking as tolerated and the additional restriction that she not lift, push, pull more than 10 pounds." (H-0627) The only change Bryant made to the physical demand profile on the computer program was to input "sedentary". (H-0627). Clean environment was not input. Nor were  restrictions included that she be able to rotate job tasks and activities or that she work in a "well-ventilated area with limited exposures to dust, mist, odors, perfumes, smoke, or extreme changes in temperature such as extreme cold or heat conditions." See Popovich report (essentially summarizing Dr. Valentino's limitations H-0619), H-0479.

Importantly, the data input did not include the fact that Kimball has to use her nebulizer machine four times a day, or every four hours which, according to her, takes about 20 minutes[22].

---

[22]  This is taken from the video mentioned earlier. Except for this piece of information the video, which the court has viewed, adds nothing to the evidence already in the record.

Neither did the  information input include that claimant has a hearing loss, her difficulty carrying on a conversation, or her need to wear hearing protection.

The court has no quarrel with the use of computers to help filter available jobs for claimants, whether in ERISA, workers compensation, social security or other cases where limitations of some sort are present[23].  However, the computer results here, considering the incorrect or incomplete information entered is, at best, only a starting point for an opinion as to employability  or life affecting decision such as terminating benefits under a contractual agreement.

<u>Conclusion</u>

When Hartford terminated benefits in February, 2005, it had considered Kimball to meet the definition of disabled for well over three years. Nothing had changed; its two doctors had simply reviewed and summarized the medical records and the treating doctors' limitations and concluded that, contrary to Dr. Valentino's opinion, Kimball could probably do something within the restrictions based on those limitations. While that may or may not be true, Hartford has not shown that there are jobs which claimant can do based on her restrictions and limitations. All of her restrictions and limitations were not considered in the computer analysis (EAR) which Hartford had done. Concrete evidence does not

---

[23] The U.S. Department of Labor lists over 12,000 jobs in its Directory of Occupational Titles. H-0028

support Hartford's decision. The termination of benefits is not supported by the administrative record and Hartford's decision is arbitrary and capricious._____

IT IS RECOMMENDED that the decision of the administrator be reversed, and that Hartford be ordered to re-institute payment of benefits as of the date of termination. Remand to the administrator is not appropriate[24].

### OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within five (5) days after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING**

---

[24] See Vega, 188 F.3d 302, f.n. 13.

17

**ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 6th day of February, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE